# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
### STATESBORO DIVISION

DERRICK W. WALKER,

                Plaintiff,

    v.

ERIC SMOKES; CARL FOUST; and
STANLEY WILLIAMS,

                Defendants.

CIVIL ACTION NO.: 6:15-cv-57

## ORDER and MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff, who is currently housed at Telfair State Prison in Helena, Georgia, filed a cause of action pursuant to 42 U.S.C. § 1983, as amended, to contest certain conditions of his confinement while he was housed at Smith State Prison in Glennville, Georgia. (Docs. 1, 13.) Defendants filed a Motion to Dismiss, (doc. 41), to which Plaintiff filed a Response, (doc. 45). Defendants filed a Reply. (Doc. 46.) Plaintiff also filed a Motion for Appointment of Counsel and a Motion for Default Judgment. (Docs. 55, 56.)

I issued an Order and Report and Recommendation on these Motions on July 2, 2018. (Docs. 58, 59.) In the preamble and conclusion of that Order and Report and Recommendation, I recommended that the District Judge dismiss as moot Plaintiff's Motion for Default Judgment. (Id. at pp. 1, 28.) However, in the body of the Order and Report and Recommendation, I directly dismissed that Motion. (Id. at p. 28.) For the sole purpose of resolving this error and conflict, I hereby **VACATE** the prior Order and Report and Recommendation, (doc. 58, 59), and issue this Order and Report and Recommendation in its stead. To be clear, this Order and Report and Recommendation is consistent in all respects with the prior Order and Report and

Recommendation, other than clarifying the above-noted scrivener's error. The Court **DIRECTS** the Clerk of the Court to note on the docket of this case the vacatur of the prior Order and Report and Recommendation, (docs. 58, 59), and to correct the docket to reflect that Plaintiff's Motion for Default Judgment, (doc. 56), is still pending awaiting an order of the District Judge.

For the reasons stated below, the Court **DENIES** Plaintiff's Motion for Appointment of Counsel. (Doc. 55.) Additionally, I **RECOMMEND** the Court **GRANT in part** and **DENY in part** Defendants' Motion to Dismiss, and I **RECOMMEND** that the Court **DISMISS as moot** Plaintiff's Motion for Default. Should the Court adopt these Recommendations, the Court should **DISMISS without prejudice** Plaintiff's claims relating to his placement in the Tier II program for his failure to exhaust his administrative remedies. Plaintiff's Eighth Amendment claims, including his claims for injunctive relief, would remain pending.

## BACKGROUND

In this action, Plaintiff alleges that he is at severe risk of attack from his fellow inmates because he disavowed his status as a member of the "Goodfellas Gang." (Docs. 1, 13.) Plaintiff states that he arrived at Smith State Prison from Georgia State Prison on August 4, 2014. (Doc. 13, p. 3.) Prior to his arrival at Smith State Prison, Plaintiff disavowed his membership in the Goodfellas gang and worked with the administration at Georgia State Prison as an informant (apparently against the Goodfellas gang). (<u>Id.</u>) Upon his arrival at Smith State Prison, a correctional officer explained to Plaintiff he would be placed in the Tier II program because all Goodfellas members were housed in that program. (<u>Id.</u> at pp. 3–4.) The officer explained that, per Defendant Stanley Williams, the Warden of Smith State Prison, Plaintiff would not be allowed to be housed in another dorm. (<u>Id.</u> at p. 4.) Plaintiff explained he severed all of his ties with the Goodfellas in October 2013 and that he was not housed in the Tier II program at

Georgia State Prison.  (Id.)  The officer responded that Defendant Williams and Defendant Eric Smokes, the unit manager, assign the inmates' housing locations and that Plaintiff's assignment was "out of her hands."  (Id.)

Plaintiff then spoke with Defendant Smokes.  (Id. at p. 5.)  Plaintiff explained to Defendant Smokes that he was no longer a member of the Goodfellas gang and that leaders of the gang, Abdul Williams and Jonathan McClendon, had "put a contract hit on [Plaintiff's] life."  (Id.)  Plaintiff was placed in a single man cell in the Tier II program, and staff explained the policies for contesting Tier II administrative segregation status.  (Id. at pp. 5, 15–16.)

On August 6, 2014, Plaintiff spoke with a "multi-functional officer" and Defendant Williams regarding his placement in Tier II.  (Id. at p. 6.)  He asked Defendant Williams when he would receive his administrative segregation hearing per the Prison's Standard Operating Procedure.  (Id.)  Warden Williams did not respond.  (Id.)  Plaintiff made several more attempts in August 2014 to speak with Williams and Smokes regarding this placement in Tier II but was unsuccessful.  (Id.)  On September 10, 2014, Plaintiff spoke with Defendant Williams and again raised his safety concerns with being placed in Tier II.  (Id. at pp. 6–7.)  Defendant Williams told Plaintiff that, as a member of the Goodfellas gang, he would not get a hearing to contest his placement in the Tier II program.  (Id.)

The Court directed service of Plaintiff's Complaint on Defendants by Order dated December 31, 2015.  (Doc. 19.)  Defendants then filed their Motion to Dismiss on August 16, 2016.  (Doc. 41.)

## DISCUSSION

In their Motion, Defendants assert Plaintiff failed to exhaust his available administrative remedies regarding his placement in administrative segregation prior to the filing of his

Complaint. Defendants contend Plaintiff does not set forth a viable Eighth Amendment claim against them. Additionally, Defendants contend Plaintiff is not entitled to injunctive relief and they are entitled to qualified immunity. (Doc. 41-1.)

In response, Plaintiff contends he exhausted his administrative remedies as to the assertions he made in his Complaint. Plaintiff maintains he sets forth sufficient facts to support his Eighth Amendment claim against Defendants. Moreover, Plaintiff asserts he is entitled to injunctive relief and Defendants are not immune from suit. (Doc. 45.)

As set forth below, I agree that Plaintiff failed to exhaust his administrative remedies as to his placement in administrative segregation prior to the filing of his Complaint and this portion of Defendants' Motion is due to be granted. However, Plaintiff does set forth sufficient facts to sustain his Eighth Amendment claims against Defendants, including his claims for injunctive relief, and these portions of Defendants' Motion are due to be denied.

## I. Whether Plaintiff Exhausted his Administrative Remedies

### A. Standard of Review for Exhaustion

The determination of whether an inmate exhausted his available administrative remedies prior to filing a cause of action in federal court is a matter of abatement and should be raised in a motion to dismiss. Bryant v. Rich, 530 F.3d 1368, 1374 (11th Cir. 2008). "Because exhaustion of administrative remedies is a matter in abatement and not generally an adjudication on the merits, an exhaustion defense . . . is not ordinarily the proper subject for a summary judgment; instead, it should be raised in a motion to dismiss, or be treated as such if raised in a motion for summary judgment." Id. at 1374–75 (internal citation omitted). "Even though a failure-to-exhaust defense is non-jurisdictional, it is like" a jurisdictional defense because such a determination "ordinarily does not deal with the merits" of a particular cause of action. Id.

at 1374 (internal punctuation and citation omitted). Further, a judge "may resolve factual questions" in instances where exhaustion of administrative remedies is a defense before the court. Id. In these instances, "it is proper for a judge to consider facts outside of the pleadings and to resolve factual disputes so long as the factual disputes do not decide the merits and the parties have sufficient opportunity to develop a record." Id. at 1376.

In Turner v. Burnside, 541 F.3d 1079 (11th Cir. 2008), the Eleventh Circuit Court of Appeals set forth a "two-step process" that lower courts must employ when examining the issue of exhaustion of administrative remedies. First, the court is to take the plaintiff's version of the facts regarding exhaustion as true. Id. at 1082. If, even under the plaintiff's version of the facts, the plaintiff has not exhausted, the complaint must be dismissed. Id. However, if the parties' conflicting facts leave a dispute as to whether plaintiff has exhausted, the court need not accept all of plaintiff's facts as true. Id. Rather, "the court then proceeds to make specific findings in order to resolve the disputed factual issues[.]" Id. "Once the court makes findings on the disputed issues of fact, it then decides whether under those findings the prisoner has exhausted his available administrative remedies." Id. at 1083. The Eleventh Circuit has held that a district court may consider materials outside of the pleadings and resolve factual disputes regarding exhaustion in conjunction with a Rule 12(b)(6) motion to dismiss so long as the factual disputes do not decide the merits of the case. See Bryant, 530 F.3d at 1376–77.

**B.      Legal Requirements for Exhaustion**

Where Congress explicitly mandates, prisoners seeking relief for alleged constitutional violations must first exhaust inmate grievance procedures before filing suit in federal court. See Porter v. Nussle, 534 U.S. 516, 524 (2002). Section 1997e(a) of Title 42 of the United States Code states, "No action shall be brought with respect to prison conditions under section 1983 of

this title, or any other Federal law . . . until such administrative remedies as are available are exhausted." In Porter, the United States Supreme Court held that exhaustion of available administrative remedies is mandatory. Porter, 534 U.S. at 523; see also O'Brien v. United States, 137 F. App'x 295, 301–02 (11th Cir. 2005) (per curiam) (finding lack of exhaustion where prisoner "prematurely filed his civil complaint . . . and . . . 'failed to heed that clear statutory command' requiring that his administrative remedies be exhausted before bringing suit"). Additionally, the Supreme Court has "held that the PLRA's [Prison Litigation Reform Act's] text suggests no limits on an inmate's obligation to exhaust—irrespective of any 'special circumstances.' And that mandatory language means a court may not excuse a failure to exhaust, even to take such circumstances into account." Ross v. Blake, 578 U.S. ___, ___, 136 S. Ct. 1850, 1856 (2016).

The requirement that the exhaustion of remedies occur "first in an agency setting allows 'the agency [to] develop the necessary factual background upon which decisions should be based' and giv[es] 'the agency a chance to discover and correct its own errors.'" Green v. Sec'y for Dep't of Corr., 212 F. App'x 869, 871 (11th Cir. 2006) (per curiam) (quoting Alexander v. Hawk, 159 F.3d 1321, 1327 (11th Cir. 1998) (first alteration in original)). Furthermore, requiring exhaustion in the prison setting "eliminate[s] unwarranted federal-court interference with the administration of prisons" and allows "corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." Woodford v. Ngo, 548 U.S. 81, 93 (2006).

The Supreme Court has noted exhaustion must be "proper." Id. at 92. "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure

on the course of its proceedings." Id. at 90–91. In other words, an institution's requirements define what is considered exhaustion. Jones v. Bock, 549 U.S. 199, 218 (2007).

Thus, under the law, prisoners must do more than simply initiate grievances; they must also appeal any denial of relief through all levels of review that comprise the administrative grievance process. Bryant v. Rich, 530 F.3d 1368, 1378 (11th Cir. 2008) ("To exhaust administrative remedies in accordance with the PLRA, prisoners must 'properly take each step within the administrative process.'" (quoting Johnson v. Meadows, 418 F.3d 1152, 1157 (11th Cir. 2005))); Sewell v. Ramsey, No. CV406-159, 2007 WL 201269 (S.D. Ga. Jan. 27, 2007) (finding that a plaintiff who is still awaiting a response from the warden regarding his grievance is still in the process of exhausting his administrative remedies).

Furthermore, an inmate who files an untimely grievance or simply spurns the administrative process until it is no longer available fails to satisfy the exhaustion requirement of the PLRA. Johnson, 418 F.3d at 1157–59; Higginbottom v. Carter, 223 F.3d 1259, 1261 (11th Cir. 2000) (inmate's belief that administrative procedures are futile or needless does not excuse the exhaustion requirement). Additionally, "[t]he only facts pertinent to determining whether a prisoner has satisfied the PLRA's exhaustion requirement are those that existed when he filed his original complaint." Smith v. Terry, 491 F. App'x 81, 83 (11th Cir. 2012) (per curiam).

"However, 'while [Section] 1997e(a) requires that a prisoner provide as much relevant information as he reasonably can in the administrative grievance process, it does not require more.'" Id. (quoting Brown v. Sikes, 212 F.3d 1205, 1207 (11th Cir. 2000)). Nevertheless, the purpose of Section 1997e(a) is not that "fact-intensive litigation" result over whether every fact relevant to the cause of action was included in the grievance. Hooks v. Rich, CV605-65, 2006 WL 565909, at *5 (S.D. Ga. Mar. 7, 2006) (internal citation omitted). "'As long as the basic

purposes of exhaustion are fulfilled, there does not appear to be any reason to require a prisoner plaintiff to present fully developed legal and factual claims at the administrative level.'" Id. (quoting Irvin v. Zamora, 161 F. Supp. 2d 1125, 1135 (S.D. Cal. 2001)). Rather, Section 1997e(a) is intended to force inmates to give state prison authorities a chance to correct constitutional violations in their prisons before resorting to federal suit and to prevent patently frivolous lawsuits. Id.

### C. The Georgia Department of Corrections' Rules and Procedures Regarding Administrative Segregation and Exhaustion Thereof

The Georgia Department of Corrections' rules and regulations concerning placement in administrative segregation can be found at Standard Operating Procedure ("SOP") IIB09-0001 and/or SOP IIB09-0003.[1] (Doc. 41-2, p. 9; Doc. 13, p. 17.) The Tier II program "is an offender management process" and was established "to protect staff, offenders, and the public from offenders[] who commit or lead others to commit violent, disruptive, predatory, or riotous actions, or who otherwise pose a serious threat to the safety and security of the institutional operation." (Id.) The Tier II program is a "[l]ong [t]erm [a]dministrative [s]egregation stratification plan that manages the institutional conduct and programmatic need of offenders assigned to the program." (Id.) The Classification Committee reviews all recommendations for assignment to the Tier II program, and the Classification Committee's recommendations are submitted directly to the Warden or designee for approval. (Id. at p. 18.) After assignment to the Tier II program, the Classification Committee holds an administrative segregation hearing within

---

[1] Defendants attached SOP IIB09-0001 to their Motion to Dismiss, whereas Plaintiff attached SOP IIB09-0003 to his Amended Complaint. SOP IIB09-0001 concerns Tier I Administrative Segregation and has an effective date of June 1, 2008, and SOP IIB09-0003 concerns Tier II Administrative Segregation and has an effective date of August 1, 2013. In addition, in Defendant Smokes' Affidavit, he references SOP IIB09-0003 and states a copy of that SOP is attached to his Affidavit. (Doc. 41-2, p. 3.) It is not. Because Plaintiff's claims concern his placement in the Tier II program, not the Tier I program, the Court refers to SOP IIB09-0003 for resolution of Defendants' assertions regarding Plaintiff's exhaustion efforts.

ninety-six (96) hours of the assignment. The Warden or designee will review all Classification Committee recommendations, and this process must be completed within seven (7) business days. Upon the Warden's (or designee's) approval of a recommendation for placement in the Tier II program, the inmate will be served with a copy of the action. (Id.) An inmate can appeal his assignment to the Tier II program "by submitting written objections . . . to the Director of Facilities Operations of his/her [d]esignee within three (3) business days from receipt of the notice." (Id.) The inmate "must include detailed information in his appeal" and submit his appeal to his assigned counselor. The review of the inmate's appeal shall be completed within fourteen (14) business days of receipt. (Id.)

After an inmate has been in the Tier II program for ninety (90) days, he will have a meeting with the Classification Committee, which is a "culmination of the previous informal . . . contacts that have been completed as part of the routine case management practices[.]" (Id. at p. 19.) The Classification Committee will review the counselor's recommendation to determine whether the inmate will transition from one phase to the next phase; be retained in the current phase or reassigned to a previous phase for ninety (90) days; assigned to segregation, the Tier I program, or general population upon completion of the Tier II program; or reassigned in the inmate's current phase at another facility. (Id.) In making its recommendation, the Classification Committee will give specific reasons for its recommendation and will consider the inmate's: length of time in the current phase; continued facility risk; number, type, and frequency of disciplinary reports; progress in the Tier II program; and demeanor with staff in the Tier II living areas and during periodic reviews. (Id.) Once the Warden or designee approves the Classification Committee's recommendation, the inmate will be served with a copy of the action. As with the initial placement in the Tier II program, the inmate is to file an appeal of the 90-day

review with the Warden within three (3) business days of receipt of the notice.  The inmate must include "detailed information appealing the assignment."  (Id.)  The Warden or designee has seven (7) business days to complete a review.  (Id.)

**D.    Plaintiff's Efforts at Exhaustion**

Defendants assert that Plaintiff failed to initiate or complete the Tier Program administrative appeal process, and his claims regarding his placement in Tier II must be dismissed based on his failure to exhaust his available remedies.  (Doc. 41-1, p. 5.)  Defendants state a review of Plaintiff's records reveals he was given a full administrative hearing upon his initial Tier II placement and was notified of his opportunity to appeal, which he failed to do.  In addition, Defendants note Plaintiff conceded he was told of the appeal process for Tier II designations and alleges he was given copies of the SOP which outlines this appeal process.  (Id. at p. 6 (citing Doc. 13, p. 15–21).)

In response, Plaintiff avers he did not have a Tier II hearing on August 6, 2014.  (Doc. 45, p. 19.)  Instead, Plaintiff asserts his first opportunity to file a Tier II appeal was on November 3, 2014, after he had his 90-day review.  (Id. at p. 20.)  Plaintiff explained in that appeal he never received a hearing.  Plaintiff alleges he used the grievance procedure that was available to him at Smith State Prison.  (Id.)

At the first step of the Turner analysis, Plaintiff failed to exhaust the administrative remedies available to him as to his placement in the Tier II program on August 6, 2014.  According to Plaintiff, he never had a hearing as to his placement on August 6, 2014, and did not have the opportunity to file an appeal until November 3, 2014.  Nevertheless, Plaintiff could have filed an appeal regarding his placement in the Tier II program on August 6, 2014, under the applicable SOP.  In fact, under that SOP, Plaintiff had three (3) business days after his placement

in the Tier II program to file an appeal, and he failed to do so. Nevertheless, assuming Plaintiff could not have filed an appeal without benefit of a hearing, Plaintiff exhausted his available administrative remedies under <u>Turner</u>'s first step. Under the more exacting crucible of <u>Turner</u>'s second step, however, Plaintiff did not properly exhaust his administrative remedies prior to the filing of his Complaint.

In his pleadings, Plaintiff admits he did not file an appeal regarding his placement in the Tier II program until November 2014, which was three months after his placement in that program. The Court notes Plaintiff's assertion that he was unable to file an appeal until after he had his 90-day review, ostensibly based on his contention he did not have any hearing until the 90-day review. In contrast, Defendants proffer that Plaintiff failed to initiate or complete the administrative remedies' process. In light of these conflicting accounts, the Court must resolve any factual dispute between the parties to determine whether Plaintiff exhausted his available administrative remedies.

In this regard, Defendants submitted the Affidavit of Defendant Smokes, a Unit Manager at Smith State Prison. Defendant Smokes states his duties include being familiar with the procedures governing inmate classification and advising members of the Classification Committee. (Doc. 41-2, p. 3.) Defendant Smokes declares the Classification Committee's records are kept in the normal course of business and are maintained within the records of the Georgia Department of Corrections. (<u>Id.</u>) Defendant Smokes also declares Plaintiff was assigned to the Tier II program on August 1, 2014, while he was housed at Georgia State Prison based on Plaintiff's validation as a member of the Goodfellas gang, "who posed a threat to the safe and secure operation of" Georgia State Prison. (<u>Id.</u> at p. 4.) Defendant Smokes avers Plaintiff was transferred to Smith State Prison on August 4, 2014, and "all requirements of the

Tier II assignment process were completed [at Smith State Prison] on August 6, 2014[,] as part of a warden-to-warden swap." (Id.) Defendant Smokes asserts Defendant Williams, the former Warden at Smith State Prison, "was notified of and approved the determination to keep [Plaintiff] in Phase II, Tier I[2] on August 6, 2014." (Id.) Additionally, Defendant Smokes states Plaintiff was given an initial 96-hour hearing on August 6, 2014, during which time Plaintiff's classification records were reviewed with him. (Id. at p. 5.) Defendant Smokes asserts he and other Smith State Prison officials determined Plaintiff should remain in the Tier II, Phase I classification, and he was given documents providing an overview of the Tier II program and ensured he was given forms to appeal his designation. Defendant Smokes also asserts decisions of the Classification Committee regarding housing and/or administrative segregation are appealable, and all counselors at the Prison have classification appeal forms available. (Id.) Defendant Smokes declares he reviewed Plaintiff's Classification Committee's records, particularly his records from August 1, 2014, forward, and that review indicated Plaintiff had not filed any Classification Committee appeal relating to his August 2014 Tier II assignment or his confinement to administrative segregation. (Id. at p. 6.)

Defendants also included a copy of the Administrative Segregation: Tier II Program Assignment Recommendation from Georgia State Prison dated August 1, 2014, which indicates the recommendation to house Plaintiff in the Tier II program because he was a validated Goodfellas gang member. (Id. at p. 20.) Plaintiff signed the Assignment Memo and acknowledged receipt of the Memo on August 1, 2014. (Id. at p. 21.) Also included on this Memo is a signature of a staff member, along with acknowledgements that Plaintiff received the Memo and an appeal form on this same date. (Id.) According to the record before the Court,

---

[2] This appears to be a typographical error in Defendant Smokes' Affidavit, as all other evidence reveals Plaintiff was placed in the Tier II program. In addition, in a footnote, Defendant Smokes notes Plaintiff was assigned to Tier II, Phase I while at Georgia State Prison. (Doc. 41-2, p. 5 n.1.)

Plaintiff had an initial 96-hour hearing on August 6, 2014, at Smith State Prison after his transfer to and assignment to the Tier II program at that Prison on August 4, 2014. (Id. at p. 24.) It appears Plaintiff gave a statement during this hearing and stated he was not a Goodfella. (Id. at p. 25.) Finally, in the Case Notes History printout Defendants provided, it states the Tier II process was explained to Plaintiff, he was given handouts relating to the Tier II program, he was allowed to ask questions, and he was given an appeal form at the conclusion of the initial 96-hour hearing. (Id. at p. 27.)

The Court notes Plaintiff's contention that he could not file an appeal until after his 90-day review in November 2014. However, the evidence of record belies Plaintiff's conclusory contention. The evidence before the Court reveals that Plaintiff had a 96-hour review hearing and was notified of his right to appeal his classification after this hearing on August 6, 2014. Plaintiff only states he did not have a hearing after his placement in the Tier II program, not that he was not aware of the right to appeal. Plaintiff did not file an appeal of his classification within three (3) business days, and thus, he did not exhaust his available administrative remedies prior to the filing of his Complaint.[3]

To the extent Plaintiff contends the lack of a hearing rendered the administrative remedies process unavailable, the Court rejects this contention. Though the Supreme Court rejected a "special circumstances" exception to exhaustion in Ross, it reiterated that a prisoner need only exhaust those remedies which were "available" to him. Ross, 578 U.S. at ___, 136 S.

---

[3] The Court recognizes that involuntary assignments to administrative segregation are not appealable under SOP IIB05-0001, the "traditional" grievance procedure within the Georgia Department of Corrections. (Doc. 45, p. 32.) However, it is unclear whether an appeal under SOP IIB09-0003 is memorialized in the same manner as grievances and appeals under SOP II05-0001 and whether those appeals would be contained in a listing of a prisoner's grievance history. (Id. at p. 55.) It appears any appeal under SOP BII09-0003 is not listed in a prisoner's grievance history, as the copies of appeals after the 90-day review proceedings Plaintiff submitted do not coincide with the dates listed on his grievance history. (Id. at pp. 47–55.)

Ct. at 1856–58 ("An inmate, that is, must exhaust available remedies, but need not exhaust unavailable ones."). The Court recognized "three kinds of circumstances in which an administrative remedy, although officially on the books, is not capable of use to obtain relief." Id. at ___, 136 S. Ct. at 1859. First, the Court stated that, in some instances, the administrative procedure "operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." Id. Thus, if the administrative procedure lacks authority or if the officials with apparent authority "decline ever to exercise it," the inmate has no obligation to exhaust the remedy. Id. Second, when administrative remedies are so confusing that they are "essentially 'unknowable,'" exhaustion is not required. Id. (citing Goebert v. Lee County, 510 F.3d 1312, 1323 (11th Cir. 2007); Turner, 541 F.3d at 1084). Lastly, exhaustion is not required "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." Id. at ___, 136 S. Ct. at 1860. However, the Supreme Court recognized that, "[g]iven prisons' own incentives to maintain functioning remedial processes, we expect that these circumstances will not often arise." Id. at ___, 136 S. Ct. at 1859 (citation omitted).

Plaintiff does not present credible evidence that he is entitled to one of the "special circumstances" exceptions to exhaustion the Supreme Court espoused in Ross. His only support for this argument is his own conclusory allegation. Further, given the support Defendants have provided, under the second Turner step, the Court finds Defendants' account of the availability of remedies more credible than Plaintiff's account. Thus, Plaintiff failed to exhaust his administrative remedies as to his placement in the Tier II program.

Consequently, the Court should **GRANT** this portion of Defendants' Motion to Dismiss and **DISMISS without prejudice** Plaintiff's claims relating to his placement in the Tier II program based on his failure to exhaust his administrative remedies as to these claims.

## II.     Plaintiff's Eighth Amendment Claim

### A.     Standard of Review

Under a Rule 12(b)(6) motion to dismiss, a court must "accept[] the allegations in the complaint as true and constru[e] them in the light most favorable to the plaintiff." Belanger v. Salvation Army, 556 F.3d 1153, 1155 (11th Cir. 2009).  "A complaint must state a facially plausible claim for relief, and '[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"  Wooten v. Quicken Loans, Inc., 626 F.3d 1187, 1196 (11th Cir. 2010) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action" does not suffice. Ashcroft, 556 U.S. at 678.

"The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully.  Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief."  Id. (internal punctuation and citation omitted).  While a court must accept all factual allegations in a complaint as true, this tenet "is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are insufficient. Id.

## B.    Deliberate Indifference to Safety

Plaintiff's allegations that he informed Defendants that members of the Goodfellas gang threatened his life implicate the Eighth Amendment's proscription against cruel and unusual punishment.  That proscription imposes a constitutional duty upon prison officials to take reasonable measures to guarantee the safety of prison inmates.  "'To show a violation of [his] Eighth Amendment rights, [a p]laintiff must produce sufficient evidence of (1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) causation.'"  Smith v. Reg'l Dir. of Fla. Dep't of Corr., 368 F. App'x 9, 14 (11th Cir. 2010) (per curiam) (quoting Purcell ex rel. Estate of Morgan v. Toombs County, 400 F.3d 1313, 1319 (11th Cir. 2005)).  "To be deliberately indifferent a prison official must know of and disregard 'an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'"  Id. (quoting Purcell, 400 F.3d at 1319–20).

Whether a substantial risk of serious harm exists so that the Eighth Amendment might be violated involves a legal rule that takes form through its application to facts.  However, "simple negligence is not actionable under § 1983, and a plaintiff must allege a conscious or callous indifference to a prisoner's rights."  Id.  In other words, to find deliberate indifference on the part of a prison official, a plaintiff inmate must show: "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence."  Farrow v. West, 320 F.3d 1235, 1245 (11th Cir. 2003) (citing McElligott v. Foley, 182 F.3d 1248, 1255 (11th Cir. 1999)).  Prison officials are not held liable for every attack by one inmate upon another, Zatler v. Wainwright, 802 F.2d 397, 400 (11th Cir. 1986), nor are they guarantors of a prisoner's safety.  Popham v. City of Talladega, 908 F.2d 1561, 1564 (11th Cir. 1990).  Rather, a

prison official must be faced with a known risk of injury that rises to the level of a "strong likelihood rather than a mere possibility" before his failure to protect an inmate can be said to constitute deliberate indifference. Brown v. Hughes, 894 F.2d 1533, 1537 (11th Cir. 1990).

Like any deliberate indifference claimant, a plaintiff must satisfy both an objective and a subjective inquiry. Chandler v. Crosby, 379 F.3d 1278, 1289–90 (11th Cir. 2004). Under the objective component, a plaintiff must prove the condition he complains of is sufficiently serious to violate the Eighth Amendment. Hudson v. McMillian, 503 U.S. 1, 8 (1992). As for the subjective component, "the prisoner must prove that the prison official acted with 'deliberate indifference.'" Miller v. King, 384 F.3d 1248, 1260–61 (11th Cir. 2004) (quoting Farmer v. Brennan, 511 U.S. 825, 837 (1994)). To prove deliberate indifference, the prisoner must show that prison officials "'acted with a sufficiently culpable state of mind'" with regard to the serious prison condition at issue. Id. (quoting Chandler, 379 F.3d at 1289–90).

Defendants contend Plaintiff makes no allegations that he is or was exposed to a substantial, imminent risk of serious injury or harm as a result of Defendants' conduct. (Doc. 41-1, p. 8.) Specifically, Defendants note Plaintiff does not contend he was physically attacked at any point during the time he has been in the Tier II program, nor has he identified a particular threat he has faced. In fact, Defendants state it is "highly improbable" that any Goodfellas gang member at Smith State Prison could cause Plaintiff harm, as he is kept in a one-man cell and has a mandatory two-officer escort at all times he is out of his cell. (Id.) Defendants assert Plaintiff fails to identify what additional protection the "protective custody" he seeks would entitle him to or how it would decrease any risk of attack Plaintiff may face more than the measures already in place do. (Id. at p. 9.) Defendants allege Plaintiff fails to set forth facts sufficient to indicate Defendants knew that Plaintiff faced a substantial risk of serious harm

and ignored that risk. (Id. at p. 11.) In fact, Defendants note Plaintiff acknowledges that each Defendant considered and addressed Plaintiff's concerns with him on numerous occasions. (Id. (citing Doc. 1, ¶¶ 16, 19; Doc. 13, ¶¶ 28, 40).) Finally, Defendants contend Plaintiff does not allege he suffered a legally cognizable injury as a result of their actions that is sufficient to state an Eighth Amendment claim. (Id. at pp. 12–13.)

Plaintiff counters that he informed Defendant Smokes he was no longer a member of the Goodfellas gang and that the two leaders of the gang, Abdul Williams and Jonathan McClendon, put a "contract hit on Plaintiff's life." (Doc. 45, p. 6.) Plaintiff avers Defendants have ignored and continue to ignore the substantial risk of serious harm Plaintiff faces. According to Plaintiff, he has "repeatedly advised" Defendants of members of the Goodfellas gang who have threatened his life, including inmates who are members of this gang and who are housed at Smith State Prison, based on Plaintiff severing ties with the gang. (Id. at p. 10.) Despite his repeated requests for reasonable measures to protect him from real and imminent threats, Defendants continue to house him in a unit with Goodfellas gang members. (Id. at p. 11.) In this regard, Plaintiff directs the Court's attention to exhibits he filed as part of his pleadings.

In particular, Plaintiff attached to his Complaint and Amended Complaint several documents regarding his attempts to convey to prison officials his concerns regarding threats from the Goodfellas and his placement in the Tier II program. For example, on September 12, 2014, Plaintiff filled out a sworn statement in which he explained to the Prison's Security Threat Group Investigator that he had severed his ties with the Goodfellas and that the gang had ordered a hit on him. (Doc. 1-5.) On November 14, 2014, Plaintiff completed a form that Defendant Carl Foust sent to him, in which Plaintiff explained to Defendant Foust that he had renounced his membership in Goodfellas and provided Defendant Foust information regarding the Goodfellas'

activities, as required by the Prison's Security Threat Group renunciation process. (Doc. 1-4.) On February 4, 2015, Plaintiff wrote to Defendant Smokes and again expressed his concerns regarding the Goodfellas. (Doc. 1-6.) He stated that he received several messages threatening harm and asked that prison administration take "reasonable measures" to "abate the risk." (Id.) On February 10, 2015, Defendants Foust and Smokes spoke with Plaintiff and denied his request for protective measures. (Doc. 1-7.) Plaintiff continued to write the prison administration in March and April 2015 expressing his concerns of retribution from the Goodfellas, including a list of specific inmates who posed harm to Plaintiff. (Docs. 1-12–1-15.) However, according to Plaintiff, Defendants have not taken any measures to address the continuing threats to his safety.

The pleadings before the Court reveal Plaintiff notified Defendants of what he deemed to be a serious risk to his safety. Plaintiff makes more than conclusory allegations that Defendants ignored his requests to be placed in "protective custody" due to threats against his life by members of the Goodfellas gang. Moreover, Plaintiff makes plausible allegations indicating Defendants were put on notice that a threat to Plaintiff's life was a "strong likelihood rather than a mere possibility." Brown, 894 F.2d at 1537. Plaintiff contends he repeatedly advised Defendants that members of the Goodfellas gang threatened to take his life due to his severance of ties with this gang and cooperation against the gang. (Doc. 45, p. 10.) Plaintiff asserts he identified specific gang members who called for a "hit" on Plaintiff, as well as inmates who are housed in the facility with Plaintiff and are gang members. (Id.) However, Plaintiff maintains Defendants ignored his requests for reasonable measures to protect him from known threats to his safety. (Id. at p. 11.) In short, Plaintiff makes sufficient allegations—at this stage of the litigation—that Defendants were aware of a serious risk of harm to his safety and ignored that

risk or otherwise were deliberately indifferent to Plaintiff's safety.  Thus, the Court should **DENY** this portion of Defendants' Motion.[4]

## III.    Qualified Immunity

Qualified immunity shields "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); see also Lee v. Ferraro, 284 F.3d 1188, 1193–94 (11th Cir. 2002).  "The purpose of this immunity is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation[.]"  Id. at 1194.

This defense "reflects an effort to balance 'the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.'"  Jones v. Fransen, 857 F.3d 843, 850–51 (11th Cir. 2017) (quoting Pearson v. Callahan, 555 U.S. 223, 231 (2009)).  "The doctrine resolves this balance by protecting government officials engaged in discretionary functions and sued in their individual capacities unless they violate 'clearly established federal statutory or constitutional rights of which a reasonable person would have known.'"  Id. at 851 (quoting Keating v. City of Miami, 598 F.3d 753, 762 (11th Cir. 2010)).

"As a result, qualified immunity shields from liability 'all but the plainly incompetent or one who is knowingly violating the federal law.'"  Id. (quoting Lee, 284 F.3d at 1194).

---

[4]  It appears Defendants wish for the Court to place upon Plaintiff the more exacting standards required when a party opposes a motion for summary judgment rather than the plausibility standard applicable to motions to dismiss.  Wooten, 626 F.3d at 1196.  The majority of the contentions set forth in Defendants' Response to Plaintiff's Request for Preliminary Injunction, (doc. 40), also appears to be akin to those made in a summary judgment motion.  Further, the Court must accept the allegations in Plaintiff's Complaint, as amended, as true.  The Court's inquiry into whether Plaintiff stated a claim upon which relief can be granted must be limited to the face of Plaintiff's Complaint, as amended.  Thus, in ruling on Defendants' Motion to Dismiss, the Court cannot engage in the factual analysis Defendants propose.

However, "the doctrine's protections do not extend to one who 'knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff].'" Id. (quoting Harlow, 457 U.S. at 815 (internal quotation marks and alteration omitted)). Additionally, "[b]ecause qualified immunity is only a defense to personal liability for monetary awards resulting from government officials performing discretionary functions, qualified immunity may not be effectively asserted as a defense to a claim for declaratory or injunctive relief." Ratliff v. DeKalb County, 62 F.3d 338, 340 n.4 (11th Cir. 1995).

To receive qualified immunity, government officials must first establish that they were acting within their discretionary authority during the events in question. Maddox v. Stephens, 727 F.3d 1109, 1120 (11th Cir. 2013). Discretionary authority includes all actions of a governmental official that "(1) were undertaken pursuant to the performance of his duties, and (2) were within the scope of his authority." Dang ex rel. Dang v. Sheriff, Seminole Cty., 871 F.3d 1272, 1279 (11th Cir. 2017) (citing Rich v. Dollar, 841 F.2d 1558, 1564 (11th Cir. 1988)).

Here, Plaintiff does not contest this issue, and it appears that Defendants were acting within their respective discretionary authorities. Defendants, while on duty as prison officials, assigned Plaintiff to Tier II and conducted other daily activities of prison administration during the events in question.

Once a defendant establishes that he was acting within the scope of his discretionary authority, "the burden shifts to the plaintiff to show that qualified immunity is not appropriate." Dang, 871 F.3d at 1279. To make this showing, a plaintiff "must first prove that the facts alleged, construed in the light most favorable to it, establish that a constitutional violation did occur." Shaw v. Selma, 884 F.3d 1093, 1099 (11th Cir. 2018) (citing Smith v. LePage, 834 F.3d

1285, 1291 (11th Cir. 2016)); Saucier v. Katz, 533 U.S. 194, 200 (2001).  At this stage of the litigation, Plaintiff has shown that Defendants "committed a clear violation of his rights under the Eighth Amendment."  Canupp v. Paul, 716 F. App'x 836, 842 (11th Cir. 2017) (per curiam).

Having alleged a constitutional violation, Plaintiff must next demonstrate "that law existing at the time . . . clearly established that the conduct violated the constitution."  Shaw, 884 F.3d at 1099 (citing Pearson, 555 U.S. at 232–36).[5]  "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  Saucier, 533 U.S. at 202; Wilson v. Layne, 526 U.S. 603, 615 (1999).  To determine "whether the law clearly established the relevant conduct as a constitutional violation at the time that [d]efendant [o]fficers engaged in the challenged acts," the defendants must have had "fair warning" that their conduct violated a constitutional right.  Fransen, 857 F.3d at 851 (citing Coffin v. Brandau, 642 F.3d 999, 1013 (11th Cir. 2011) (citations and internal quotation marks omitted)).  "'Fair warning' comes in the form of binding caselaw from the Supreme Court, the Eleventh Circuit, or the highest court of the state . . . that 'make[s] it obvious to all reasonable government actors . . . that what he is doing violates a federal law.'"  Id. (alteration in original) (quoting Priester v. City of Riviera Beach, 208 F.3d 919, 926 (11th Cir. 2000) (citation omitted)).

While a plaintiff need not supply "a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate."  White v. Pauly, 580 U.S. ___, ___, 137 S. Ct. 548, 551 (2017) (per curiam).  Notably, "officials can still be on notice that their conduct violates established law even in novel factual circumstances."  Hope v. Pelzer, 536 U.S. 730, 741 (2002); see also Harris v. Coweta County, 21

---

[5]  Courts may "exercise their sound discretion in deciding" what order to analyze the constitutional violation and clearly established right prongs.  Pearson, 555 U.S. at 236.

F.3d 388, 393 (11th Cir. 1994) ("The 'very action in question' does not have to have been previously held unlawful, but the unlawfulness of the conduct must be apparent in light of pre-existing law." (citing <u>Anderson v. Creighton</u>, 483 U.S. 635, 640 (1987))).  In light of this, there are three ways a plaintiff may demonstrate that a defendant had "fair warning" that a right is clearly established: "(1) case law with indistinguishable facts clearly establishing the constitutional right; (2) a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right; or (3) conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law."  <u>Maddox</u>, 727 F.3d at 1121 (quoting <u>Lewis v. City of West Palm Beach</u>, 561 F.3d 1288, 1291 (11th Cir. 2009)); <u>see also Fransen</u>, 857 F.3d at 852 (same).

"Some broad statements of principle in case law are not tied to particularized facts and can clearly establish law applicable in the future to different sets of detailed facts."  <u>Terrell v. Smith</u>, 668 F.3d 1244, 1256 (11th Cir. 2012) (quoting <u>Vinyard v. Wilson</u>, 311 F.3d 1340, 1351 (11th Cir. 2002)); <u>cf.</u> <u>Kisela v. Hughes</u>, 584 U.S. ___, ___, 138 S. Ct. 1148, 1153 (2018) (per curiam) ("Of course, general statements of the law are not inherently incapable of giving fair and clear warning to officers." (quoting <u>White</u>, 580 U.S. at ___, 137 S. Ct. at 552)).[6]  However, "the principle must be established with 'obvious clarity' by the case law so that 'every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted.'"  <u>Terrell</u>, 668 F.3d at 1256 (citing <u>Vinyard</u>, 311 F.3d at 1351); <u>Fransen</u>, 857 F.3d at 852.  Importantly, the "reasoning, though not the holding of

---

[6]  In <u>Kisela</u>, the Supreme Court cautioned courts not to "define clearly established law at a high level of generality."  584 U.S. at ___, 138 S. Ct. at 1152 (citation and internal quotations omitted).  However, <u>Kisela</u> involved the Fourth Amendment and excessive force—an area in which "specificity is especially important."  <u>Id.</u> (alteration omitted).  Because excessive force in the Fourth Amendment context "is an area of law in which the result depends very much on the facts of each case," officers are entitled to qualified immunity "unless existing precedent squarely governs the specific facts at issue."  <u>Id.</u> at ___, 138 S. Ct. at 1152–53 (internal quotations and citations omitted).

prior cases can also send the same message to reasonable officers in novel factual situations."

Mercado v. City of Orlando, 407 F.3d 1152, 1159 (11th Cir. 2005) (citation and internal quotation marks omitted).

Defendants assert Plaintiff fails to allege a violation of any clearly established constitutional right, and they are entitled to qualified immunity as a result. (Doc. 41-1, p. 14.)  It is well-settled that a prison official's "deliberate indifference" to a substantial risk of serious harm to an inmate violates the Eighth Amendment.  Helling v. McKinney, 509 U.S. 25 (1993); Estelle v. Gamble, 429 U.S. 97 (1976).  Prison administrators "are under an obligation to take reasonable measures to guarantee the safety of the inmates."  Hudson v. Palmer, 468 U.S. 517, 526–27 (1984).  Specifically, prison officials have a duty to protect prisoners from violence at the hands of other prisoners.  Wilson v. Seiter, 501 U.S. 294, 303 (1991).  If a prisoner puts prison officials on notice that he is at risk of harm from other prisoners, and then suffers a harm that could have been prevented by reasonable measures, those officials may be held liable. Shabazz v. Barrow, No. CIV.A.7:05CV46(HL), 2006 WL 826712, at *6 (M.D. Ga. Mar. 29, 2006).  This is what Plaintiff alleges happened in the case at hand.  Consequently, Defendants are not entitled to qualified immunity, as Plaintiff has set forth a plausible violation of his clearly established rights under the Eighth Amendment.  See Maddox, 727 F.3d at 1121.  Thus, the Court should **DENY** this portion of Defendants' Motion.

## IV.  Plaintiff's Injunctive Relief Claims

Defendants aver Plaintiff appears to seek an injunction ordering them to release him from Tier II to protective custody.  However, Defendants contend Plaintiff fails to establish a violation

of any federal right, and absent any violation, he is not entitled to injunctive relief.[7]  (Doc. 41-1, p. 14.)

Section 3626 of Title 18 of the United States Code, which affords for appropriate remedies in prisoner litigation, provides, in relevant part:

> Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs.  The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief.

18 U.S.C. § 3626(a)(1)(A).

As explained above, Plaintiff has plausibly alleged that Defendants violated his Eighth Amendment rights.  At this early stage, the Court cannot ascertain whether it would be appropriate for this Court to order Defendants to release Plaintiff from Tier II to protective custody to correct that violation.  It may be that such relief would be the "least intrusive means" to vindicate Plaintiff's Eighth Amendment rights.  The Court recognizes that such a decision lies squarely under the purview of "prison administration", and this Court is loath to interfere with the administrative processes of a prison.  See McCoy v. Chatman, 2017 WL 4212310, at *2 (M.D. Ga. July 7, 2017) (noting that, even as to less intrusive means options under Section 3626, "it is generally intrusive for courts to dictate individual classification decisions or other day-to-day aspects of prison administration." (citing Preiser v. Rodriguez, 411 U.S. 475, 491–92 (1973))).  However, without a more developed factual record, the Court is equally loath to foreclose injunctive relief in this case at such an early stage.  It may be that Plaintiff establishes

---

[7]  The parties appear to use "injunctive relief" interchangeably with "prospective relief".  Because Defendants cite to 18 U.S.C. § 3626 in support of their entitlement to dismissal of Plaintiff's injunctive relief claims, the Court uses "prospective relief" where appropriate.

facts warranting his release from Tier II custody or some other fashion of less intrusive injunctive relief. Accordingly, the Court should **DENY** this portion of Defendants' Motion to Dismiss.

## V.     Plaintiff's Motion for Appointment of Counsel

Plaintiff has filed a Motion for Appointment of Counsel seeking assistance in this case. (Doc. 55.) In this civil case, Plaintiff has no constitutional right to the appointment of counsel. Wright v. Langford, 562 F. App'x 769, 777 (11th Cir. 2014) (citing Bass v. Perrin, 170 F.3d 1312, 1320 (11th Cir. 1999)). "Although a court may, pursuant to 28 U.S.C. § 1915(e)(1), appoint counsel for an indigent plaintiff, it has broad discretion in making this decision, and should appoint counsel only in exceptional circumstances." Id. (citing Bass, 170 F.3d at 1320). Appointment of counsel in a civil case is a "privilege that is justified only by exceptional circumstances, such as where the facts and legal issues are so novel or complex as to require the assistance of a trained practitioner." Fowler v. Jones, 899 F.2d 1088, 1096 (11th Cir. 1990) (citing Poole v. Lambert, 819 F.2d 1025, 1028 (11th Cir. 1987); Wahl v. McIver, 773 F.2d 1169, 1174 (11th Cir. 1985)). The Eleventh Circuit has explained that "the key" to assessing whether counsel should be appointed "is whether the *pro se* litigant needs help in presenting the essential merits of his or her position to the court. Where the facts and issues are simple, he or she usually will not need such help." McDaniels v. Lee, 405 F. App'x 456, 457 (11th Cir. 2010) (per curiam) (quoting Kilgo v. Ricks, 983 F.2d 189, 193 (11th Cir. 1993)).

The Court has reviewed the record and pleadings in this case and finds no "exceptional circumstances" warranting the appointment of counsel. While the Court understands that Plaintiff is incarcerated, this Court has repeatedly found that "prisoners do not receive special consideration notwithstanding the challenges of litigating a case while incarcerated." Hampton

v. Peeples, No. CV 614-104, 2015 WL 4112435, at *2 (S.D. Ga. July 7, 2015). "Indeed, the Eleventh Circuit has consistently upheld district courts' decisions to refuse appointment of counsel in 42 U.S.C. § 1983 actions similar to this case for want of exceptional circumstances." Id. (citing Smith v. Warden, Hardee Corr. Inst., 597 F. App'x 1027, 1030 (11th Cir. 2015) (per curiam)); see Wright, 562 F. App'x at 777; Faulkner v. Monroe Cty. Sheriff's Dep't, 523 F. App'x 696, 702 (11th Cir. 2013) (per curiam); McDaniels, 405 F. App'x at 457; Sims v. Nguyen, 403 F. App'x 410, 414 (11th Cir. 2010) (per curiam); Fowler, 899 F.2d at 1091, 1096; Wahl, 773 F.2d at 1174). This case is not so complex legally or factually to prevent Plaintiff from presenting "the essential merits of his position" to the Court.

For these reasons, the Court **DENIES** Plaintiff's Motion.

## VI. Plaintiff's Motion for Default (Doc. 56)

Plaintiff avers he filed his Complaint on May 18, 2015, and Defendants did not respond to the allegations contained in his Complaint within thirty (30) days. (Doc. 56, pp. 1–2.) Accordingly, Plaintiff submits the Court should find Defendants in default. (Id. at p. 2.)

Plaintiff filed his cause of action pursuant to 42 U.S.C. § 1983 on May 26, 2015. (Doc. 1.) The Court conducted its requisite frivolity review of Plaintiff's Complaint, as amended, and, on December 31, 2015, this Court directed service of Plaintiff's Complaint and Amended Complaint on Defendants. (Doc. 19.) In so doing, the Court directed the United States Marshal to effect service of Plaintiff's Complaint and Amended Complaint on Defendants and noted that the Marshal would request Defendants waive formal service. The Court informed Defendants that, if they timely returned this waiver, they would not have to answer Plaintiff's Complaint until sixty (60) days after the request for waiver was sent. (Id. at p. 15.) All three Defendants' Waivers of the Service of Summons were filed with the Court on February 8, 2016,

and these waivers indicate they were sent to Defendants on January 5, 2016.[8] (Docs. 22, 23, 24.) As such, Defendants Foust and Smokes were not required to file any responsive pleading until March 7, 2016. See Fed. R. Civ. P. 4(d)(3), 12(a)(1).

Defendants' counsel filed a Notice of Waiver of Reply on March 7, 2016. (Doc. 31.) The Court notified counsel on August 2, 2016, that she was required to file a responsive pleading on behalf of Defendants because the Court had sanctioned the allegations contained in Plaintiff's Complaint, as amended. (Doc. 39.) The Court directed counsel to file a responsive pleading on Defendants' behalf on or before August 16, 2016. (Id. at p. 5.) In response to this Court's Order, Defendants filed the instant, timely Motion to Dismiss on August 16, 2016. (Doc. 41.) As a result, the Court should **DISMISS as moot** Plaintiff's Motion for Default.

## CONCLUSION

For the foregoing reasons, I **RECOMMEND** the Court **GRANT in part** and **DENY in part** Defendants' Motion to Dismiss, and I **RECOMMEND** the Court **DISMISS as moot** Plaintiff's Motion for Default. Should the Court adopt these Recommendations, the Court should **DISMISS without prejudice** Plaintiff's claims relating to his placement in the Tier II program due to his failure to exhaust his administrative remedies. Plaintiff's Eighth Amendment claims, including his claims for injunctive relief, would remain pending. The Court **DENIES** Plaintiff's Motion for Appointment of Counsel.

The Court **ORDERS** any party seeking to object to this Report and Recommendation to file specific written objections within fourteen (14) days of the date on which this Report and

---

[8] Initially, there was confusion as to whether Plaintiff intended to name Doug Williams or Stanley Williams as a Defendant. Plaintiff clarified he intended to name Stanley Williams as a Defendant, and the Court directed service of Plaintiff's Complaint and Amended Complaint upon Stanley Williams on March 9, 2016. (Docs. 28, 33.) Defendant Stanley Williams was to file a responsive pleading on or before May 9, 2016, yet his counsel filed a Notice of Waiver of Reply on his behalf on May 9, 2016, (doc. 34). (Doc. 39, p. 4.)

Recommendation is entered. Any objections asserting that the Magistrate Judge failed to address any contention raised in the Complaint must also be included. Failure to do so will bar any later challenge or review of the factual findings or legal conclusions of the Magistrate Judge. <u>See</u> 28 U.S.C. § 636(b)(1)(C); <u>Thomas v. Arn</u>, 474 U.S. 140 (1985). A copy of the objections must be served upon all other parties to the action.

Upon receipt of Objections meeting the specificity requirement set out above, a United States District Judge will make a *de novo* determination of those portions of the report, proposed findings, or recommendation to which objection is made and may accept, reject, or modify in whole or in part, the findings or recommendations made by the Magistrate Judge. Objections not meeting the specificity requirement set out above will not be considered by a District Judge. A party may not appeal a Magistrate Judge's report and recommendation directly to the United States Court of Appeals for the Eleventh Circuit. Appeals may be made only from a final judgment entered by or at the direction of a District Judge. The Court **DIRECTS** the Clerk of Court to serve a copy of this Report and Recommendation upon the parties.

**SO ORDERED** and **REPORTED and RECOMMENDED**, this 3rd day of July, 2018.

R. STAN BAKER
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA